Filed 5/28/13  P. v. Thompson CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAMARCUS ANTHONY THOMPSON,<br><br>        Defendant and Appellant. | A133858<br><br>(Alameda County<br>Super. Ct. No. H49879B) |

## I.  INTRODUCTION

Appellant Damarcus Thompson was convicted by a jury of three counts arising out of a car crash in which he and codefendant Cheleia Swayne were in the driver's seat of appellant's car, traveling at high speed while under the influence of alcohol, when they hit a curb and slammed head-on into a gas station pole.[1]  When police arrived, the car was on fire.  The front seat passenger was engulfed in flames and died at the scene.  The two back seat passengers were rescued but sustained serious injuries.  Appellant contends the trial court prejudicially misinstructed the jury on several points and that the evidence was insufficient to support his three convictions.  He also argues prosecutorial misconduct and that the trial court abused its discretion in sentencing him.  On the basis of a discrete sentencing error raised by respondent and unrelated to appellant's

---

[1] Codefendant Cheleia Swayne was tried and convicted in the same proceeding. Her appeal is pending in case number A133761.

1

contentions, we will reverse the sentence and remand for resentencing, as we explain herein; in all other respects we affirm the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

On June 14, 2011, the Alameda County District Attorney filed a consolidated information charging appellant and Swayne with gross vehicular manslaughter (Pen. Code, § 191.5, subd. (a)), with an allegation that appellant fled the scene of the crime (Veh. Code, § 20001, subd. (c)) (count 1), and driving under the influence of alcohol and causing personal injury (Veh. Code, § 23153, subd. (a)) (count 2).  The information also charged appellant with leaving the scene of an accident involving injury (Veh. Code, § 20001, subd. (a)) (count 5).  Swayne was also charged with driving with a 0.08 percent blood-alcohol level and causing injury (Veh. Code, § 23153, subd. (b)) (count 3) and driving when her driving privilege was revoked (Veh. Code, § 14601.2, subd. (a)) (count 4).

As to count 2, the information alleged that appellant and Swayne caused bodily injury and death to multiple victims (Veh. Code, § 23558), drove at an excessive rate of speed (Veh. Code, § 23582), and caused great bodily injury to La'Camii Ross, Everett Jackson, and Jalisha Harris, elevating the offense to a serious felony (Pen. Code, § 1192.7, subd. (c), 12022.7, subd. (a)).  Count 3 contained these same alleged enhancements against Swayne.

The matter went to trial before a jury, and the following evidence was adduced. Before the Crash

On August 14, 2009, Jalisha Harris and Swayne spent the afternoon together riding around in appellant's black Lexus.  Harris testified that Swayne was driving and Harris sat in the front passenger seat.  When it got dark, they drove to their friend Rob's house in East Oakland.  Harris, Swayne, and Rob stood outside talking on the driveway.

---

[2] Because much, but not all, of the factual and procedural background for appellant Thompson is identical to that of his codefendant Swayne, and both appeals rely on the same record, we will incorporate portions of this section of our opinion in *People v. Swayne*, case No. A133761.

2

At around 8:00 p.m., Swayne bought a pint of Amsterdam gin and drank it with Harris for an hour until it was empty. Swayne went back to the liquor store and bought another pint bottle of Amsterdam gin which she shared with Harris and one or two other people until it was empty. Harris felt "tipsy" and she testified that Swayne was in the same condition, i.e., intoxicated but able to speak and walk normally.

La'Camii Ross was dropped off at the house where Harris and Swayne were standing in the driveway. No alcohol was being consumed at this point, and the group hung out for another hour. Around midnight, Harris asked Swayne to drop her off at a friend's home and to pick her up an hour later.

When Harris came outside to be picked up, she saw the Lexus in the parking lot with the right rear passenger door open. Everett Jackson was sitting in the middle of the back seat. The driver's seat was pushed all the way back and leaned so far back that no one could sit directly behind it in the back seat. Appellant sat in the driver's seat with Swayne on his lap. Ross was in the front passenger seat. Harris got in the back seat on the right side behind Ross. She could not tell if anyone put on a seatbelt. She did not put on her seatbelt. Harris knew Jackson because she had dated him. She knew appellant by his street name, "Devil."

As soon as she got in the car, it took off. Harris did not have a clear recollection of whose hands were on the steering wheel and she did not see whose feet were on the pedals. She recalled testifying previously that she saw Swayne's hands on the wheel. She explained that she was not changing her story at trial, but that she had suffered memory loss and memory changes.

Although Harris felt the effects of intoxication, she had memories of the drive. She remembers leaving the driveway of the apartment complex, turning left on Macarthur Boulevard, and going fast. The car was traveling at "freeway speed." She did not remember any stops and did not remember if she was awake during the drive. The last thing she remembered was seeing the Quik Stop on Macarthur Boulevard in San Leandro.

Everett Jackson testified that he had been "hanging out" at his grandmother's house on 100th Avenue and Macarthur Boulevard on the evening of August 14. He was

3

with a group of people including appellant, his cousin. They were drinking Amsterdam gin out of two or three pint-sized bottles.

Some time before midnight, the group congregated outside a nearby bar called the Sports Page. Before arriving at the Sports Page, the group bought two more bottles of alcohol. Jackson saw appellant drinking alcohol and observed that appellant was "sort of" experiencing the effects. After the bar closed at 2:00 a.m., Swayne drove up in a black Lexus with passengers Harris and Ross. Swayne got out of the car. Jackson got into the driver's side back seat. Appellant sat in the driver's seat and Swayne sat on his lap. Jackson did not have his seatbelt on and he did not see appellant or Swayne put on the seatbelt, turn on the car, steer, or operate the pedals. The last thing Jackson remembered was seeing the Quik Stop in San Leandro.

The Crash and the Aftermath

On August 15, 2009, just after 3:00 in the morning, Shirley McGee was at home watching television when she heard a loud smash outside. She lived in an apartment on the corner of Grand Avenue and Joaquin Street in San Leandro. She went outside onto the porch and saw a car that had crashed into a pole at the gas station across the street. There was a lot of smoke in the car. McGee ran back into the apartment, grabbed her phone, and went back out to the porch. She called 911. From across the street, she could hear people inside the car crying loudly for help.

After calling 911, McGee saw a man walk out of the smoke of the crash site. He ran across the street towards McGee and proceeded in the direction of the freeway. The man appeared to be hurt; he walked with a limp.

McGee called 911 two more times because the situation inside the car was getting worse—she could see fire—and help had not yet arrived.

At 3:19 a.m., Officer Michael Benz of the San Leandro Police Department was dispatched to the crash site. He arrived at the Coast Gas Station in the 1400 block of Grand Avenue in his marked police vehicle with the lights and siren activated. Before he parked, he could see a Black male crossing the street from east to west, about 50 feet

4

away.  Officer Benz grabbed a fire extinguisher from his patrol car and ran towards the burning vehicle.

Officer Benz heard a female voice yelling for help and saying she could not get out of the car.  Officer Benz found Jalisha Harris in the back seat, face down.  Her lower torso, waist, and legs were in the car; her upper torso, arms, and head were outside the car on the ground.  Not knowing the extent of Harris' injuries or if she was pinned inside the car, Officer Benz decided to try to put out the fire first.  The majority of the fire was in the front passenger area of the car.  The fire extinguisher was ineffective.  Two other officers on the scene were also trying to put out the fire.  Officer Benz could see someone in the front passenger seat.  The officers pulled Harris from the car and set her down a safe distance from the car.  They were unable to reach the front seat passenger, Ross, because the fire was too intense.  Officer Benz saw what appeared to be a pair of jeans on the rear floorboard.  He also noticed that the impact of the crash had pushed the gas pedal significantly closer to the driver's seat.

Officer Liaquat Khan was on duty in north San Leandro when he heard Officer Benz's initial reports from the scene of the car crash.  He decided to respond to the scene when he heard Officer Benz's voice become more excited and that the vehicle involved was fully engulfed in flames.  When Officer Khan arrived, there were three patrol cars present, but no fire or medical personnel.  The other officers were attending to Harris and Swayne.  Officer Khan approached to within five feet of the car on the driver's side and noted that the driver's door and left rear door were open all the way and that there was a person in the right front passenger seat.  The fire was inside the car's passenger and engine compartments, and flames were shooting up about 10 feet into the air.  Officer Khan heard moaning from the back seat and saw what initially appeared to be a pair of jeans, but turned out to be a person.  Officer Khan could not get close to the person because of the flames, but kept trying, unsuccessfully, to put out the fire.

When the fire department arrived, Officer Khan told one of the firefighters that someone was alive in the back of the car.  The fire department put out the fire and rescued a male later identified as Everett Jackson from the back seat.

5

After the fire was out, Officer Benz spoke with Swayne. He noted that she had red watery eyes, slurred speech with deliberate pronunciation, and the odor of alcohol coming from her person. Officer Benz did not perform field sobriety tests because Swayne required medical attention for an injury to her right ankle which appeared to be either dislocated or broken. Officer Benz asked her a number of questions from a form and recorded her answers in writing. Swayne did not answer most of the questions, but said she had been driving from Oakland to San Leandro. Officer Benz arrested her for driving under the influence of alcohol and causing injury. Swayne was then transported to the hospital.

Appellant was not located at the scene of the accident.[3]

Everett Jackson was taken to Eden Hospital. Officer Benz saw him there in the trauma room. One of his legs was in a splint; he was hooked up to a ventilator; and he was unconscious.

Jackson had a broken leg and was unconscious for two weeks. He was then in rehabilitation care for six weeks. Ever since the accident, he has suffered memory problems and seizures. Apparently, he is no longer the person he was before the accident.

Officer Khan interviewed Jalisha Harris at the hospital and wrote down her statement. Harris was physically unable to sign it.

Harris testified that she remembered seeing smoke and the paramedic standing over her as she was hanging out of the car door. Her neck hurt and she could not move. Harris woke up again in the intensive care unit of the hospital. She had suffered a broken neck and fractured her hand. She had to wear a metal halo screwed into her skull for three months. She had residual scars and long-term problems with her back, leaving her unable to work.

---

[3] An arrest warrant was issued and appellant was finally apprehended more than a year and a half later, in March 2011. At the time of his arrest, he had cut his distinctive shoulder-length dreadlocks and had a very short haircut.

La'Camii Ross, the front seat passenger, died at the scene. Dr. Paul Herrmann performed an autopsy and testified at trial. Ross's "body was severely burned, charred on most of the skin surface," including most of her face, her teeth, and her ears. The charring continued on her neck, chest, abdomen, legs, arms, and hands. Dr. Herrmann noted a fractured ankle and fractured ribs, one of which lacerated her left lung. Ross had no serious head injuries, leading Dr. Herrmann to opine that Ross was alive when the fire started. She probably died within seconds by inhaling hot gas. The cause of death was blunt trauma and extensive thermal burns.

Jonathan Knapp, the director of the Valley Toxicology Forensic Laboratory, testified as an expert in impairment. Mental impairment begins to occur when a person's blood alcohol content is between 0.03 and 0.06 percent. At a level of 0.08 percent, an individual's visual focus and peripheral vision is detrimentally affected. At 0.15 percent, most people will lose all peripheral vision.

On August 21, 2009, an employee of Valley Toxicology Forensic Laboratory examined a sample of Swayne's blood from the day of the incident. The result was a blood alcohol content of 0.12 percent. On October 18, 2010, Knapp conducted the test again because the employee who performed the first test was no longer working for the laboratory. The result was a blood alcohol content of 0.10 percent. Knapp testified that a reason for the lower blood alcohol level was the year-long period between tests and the volatile nature of blood specimens.

Officer Joe Molettieri, a traffic investigator for the San Leandro Police Department, concluded that the Lexus first hit the curb of the street, traveled 40 to 45 feet, and then hit the pole. The front of the car hit the square cement block holding up the pole. There were no skid marks, which would have been evidence of braking.

Scott Sorensen, formerly a traffic division investigator for the Hayward Police Department, was trained in accident investigation and reconstruction. Sorensen performed a crush analysis and determined that the speed of the Lexus when it hit the pole was between 44.25 and 50.46 miles per hour. The speed limit on Grand Avenue is 35 miles per hour, and many of the posted speed limit signs along the route traveled by

7

the Lexus were 30 miles per hour. Sorensen's calculations were based solely on the crush damage to the car, and established the minimum speed the vehicle could have been traveling at the time of impact. According to Sorensen, other factors such as flying debris, which did not figure into the crush analysis, indicated that the car's speed was actually higher.

Thompson is five feet five and a half inches tall with shoes on; he is five feet four inches without shoes. Swayne is five feet eight inches tall. The distance from the Sports Page bar to the crash site is approximately 4.2 miles. There were at least seven controlled intersections along the driving route.

Both defendants were convicted by the jury as charged, and all allegations were found true. The court sentenced appellant to 20 years, 10 months in state prison. Swayne was sentenced to 15 years, 4 months.

Appellant filed a timely notice of appeal.

### III. DISCUSSION

A.    *Instruction on Driver or Driving*.

Appellant contends that the trial court failed to instruct the jury on the meaning of the term "driver" or the act of "driving" a vehicle. Such failure would certainly be problematic where, as here, the act of driving is an essential element of the offense of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)) and drunk driving causing injury (Veh. Code, § 23153, subd. (a)), as well as other Vehicle Code sections charged. However, such failure did not occur.

The trial court instructed the jury as follows: "A driver is a person who drives or is in actual physical control of a vehicle. [¶] A person drives a vehicle when he or she intentionally causes it to move by exercising actual physical control over it. The person must cause the vehicle to move, but the movement may be slight." This instruction was provided to the jury in writing and was discussed by both the prosecutor and appellant's counsel in their closing arguments.

8

B.    *Aiding and Abetting Instruction.*

    1.    *Factual background.*

Counsel for both co-defendants objected to the aiding and abetting instructions requested by the prosecution, claiming they were unsupported by the evidence. The trial court overruled the objections and instructed the jury as follows:

"A person may be guilty of a crime in two ways:

"One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted the perpetrator who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"One, the perpetrator committed the crime; two, defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and, four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

9

The prosecutor also requested, and the trial court provided, a supplemental special instruction on aiding and abetting: "Those who aid and abet a crime and those who directly perpetrate the crime are principals and equally guilty of the commission of that crime. You need not unanimously agree, nor individually determine, whether a defendant is an aider and abettor or a direct perpetrator. The individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he or she was the aider and abettor, but no such doubt that he or she was one or the other."

2.    *Analysis.*

Appellant contends the court's aiding and abetting instruction was incomplete and therefore erroneous because, as a matter of law, a passenger cannot be liable for aiding and abetting driving offenses such as gross vehicular manslaughter or drunk driving causing injury unless the jury finds that the passenger exerted actual physical control over the vehicle, i.e., drove it, at some point during the ride in question. The argument has no merit.

On appeal, we apply the de novo standard of review to claims of instructional error. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretations.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

We find no support for appellant's attempt to engraft onto aider and abettor liability for drunk driving offenses causing death or injury the requirement that the aider and abettor have physical control of the car. Our Supreme Court has determined that

10

"both aiders and abettors and direct perpetrators can 'commit[]' the substantive crime of gross vehicular manslaughter." (*People v. Calhoun* (2007) 40 Cal.4th 398, 403.) As the trial court instructed, to find a defendant guilty of aiding and abetting a crime, the jury must find that the perpetrator committed the crime, the defendant knew of the perpetrator's intent to commit the crime, the defendant intended to aid and abet, and the defendant's words or conduct did in fact aid, encourage, promote, facilitate, etc., the commission of the crime. (*People v. Marshall* (1997) 15 Cal.4th 1, 40; *People v. Beeman* (1984) 35 Cal.3rd 547, 561.) Thus, aider and abettor liability involves both the mental components of awareness of the perpetrator's unlawful intent and the intent to assist the perpetrator in committing the crime, and the conduct component of words or action that in fact assists the commission of the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) However, appellant points us to no authority for a specific requirement that aiding and abetting a driving offense requires the act of driving. This is not surprising in light of the fact that aider and abettor liability is " 'derivative,' that is, it results from *an act by the perpetrator* to which the accomplice contributed." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, italics added.) Indeed, an aider and abettor need not even have been present during the offense. (CALCRIM No. 401.)

Appellant relies on *People v. Verlinde* (2002) 100 Cal.App.4th 1146 (*Verlinde*), in which the defendant was driving her pickup truck while intoxicated and crashed, killing one passenger and seriously injuring the two others. She was convicted of gross vehicular manslaughter and other counts related to killing and causing injury while driving drunk. (*Id.* at p. 1154.) One of Verlinde's arguments on appeal was that prosecution witness Mark Vessells, one of the injured passengers, was an accomplice to the drunk driving counts as a matter of law and that the jury should have been so instructed. (*Id.* at pp. 1160-1164.) The evidence showed that four people were "squeezed into the cab of a small pickup truck": Verlinde was in the driver's seat, Vessells sat "'squashed' between the driver's side door and Verlinde's left side," and the two others were on the passenger side. (*Id.* at pp. 1155, 1162.) Both Vessells and Verlinde were intoxicated, and they shared the driving for part of the ride. Verlinde

11

operated the stick shift and the pedals during the entire drive; Vessells took over steering for awhile but Verlinde resumed steering when Vessells said he could not continue. (*Id*. at p. 1155.) Within minutes, Vessells fell asleep. The pickup was headed north on Interstate 5 when it crashed into the back of a flatbed truck that was parked in the emergency lane off the highway. (*Id*. at pp. 1156-1157.) Verlinde was convicted of gross vehicular manslaughter while intoxicated, vehicular manslaughter without gross negligence, driving under the influence and causing injury, and driving with a blood alcohol content over 0.08, with enhancements for causing injury to two victims. (*Id*. at p. 1154.)

The appellate court rejected the argument that Vessells was an aider and abettor *as a matter of law* on the counts involving drunk driving causing death and injury, but found that the evidence raised the potential for aiding and abetting liability and that the jury should have been instructed to make that determination. (*Id*. at pp. 1161-1162.) In considering whether the jury should have been charged with determining accomplice liability, the court observed that "[o]ne reasonable inference to draw from this scenario was that Vessells was encouraging an intoxicated Verlinde to drive . . . . Also, the timing of when Vessells relinquished the steering wheel and fell asleep presented a jury question. There is no doubt that Vessells and Verlinde acted in concert in driving the vehicle, but it is unclear at what point Vessells stopped driving and fell asleep. Furthermore, when Vessells fell asleep, did he abandon his role in the continuing crime? . . . [¶] On this record, Vessells was a potential accomplice of gross vehicular manslaughter and felony drunk driving. Vessell's actions were subject to a variety of interpretations; whether these actions amounted to aiding and abetting the charged crimes was a matter of factual dispute." (*Id*. at p. 1162.)

In support of his contention that aider and abettor liability requires actual physical control of the vehicle, appellant cites the *Verlinde* court's statement that "[o]rdinarily, accomplice liability under a coperpetrator theory or an aider and abettor theory is not associated with the crimes of gross vehicular manslaughter and felony drunk driving because of the individual nature of the act and mental state involved. However, this case

12

presents an unusual factual situation with shared driving by two intoxicated individuals. . . . [W]e find accomplice liability for these crimes is possible under this factual pattern." (*Id*. at p. 1160.)"

According to appellant, *Verlinde* stands for the propositions that (1) the general rule is no aider and abettor liability for these crimes, and (2) the exception is a situation where both individuals are shown to have driven the vehicle. Thus, and necessarily, the argument goes, because there was no evidence that appellant's hands were on the wheel or his feet were on the pedals, he cannot be guilty of aiding and abetting Swayne's gross vehicular manslaughter and felony drunk driving. We disagree. This reading of *Verlinde* is overly narrow. Although the *Verlinde* shared-driving scenario is one set of facts giving rise to potential aider and abettor liability, it is not the only one and nothing in *Verlinde* purports to limit aider and abettor liability to shared driving. The required elements for aiding and abetting are that a defendant intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the offense.

Here, appellant, who had been drinking, got into the driver's seat and allowed his intoxicated girlfriend, Swayne, to sit in his lap while traveling for some four miles at near highway speeds until they crashed after failing to negotiate a curve in the road. This was more than a mere agreement to assist Swayne in driving, and appellant was no ordinary passenger. The jury could have inferred that appellant encouraged Swayne to drive and facilitated Swayne's criminal conduct by creating a situation in which it was highly unlikely that the car could be driven safely. Harris testified that, because Swayne was on top of appellant's legs, she was higher up in the seat and "slouched down" in order to see out the windshield. Moreover, although no witnesses saw appellant's hands on the wheel or his feet on the pedals, it is also the case that no witnesses saw Swayne's feet on the pedals and Harris's testimony about seeing Swayne's hands on the wheel was less than definitive. Thus, whether appellant exerted any actual physical control over the Lexus or by his conduct aided, facilitated, promoted, encouraged, or instigated the commission of the charged offenses were questions for the jury. The trial court properly instructed on aider and abettor liability.

13

In his reply brief, appellant argues for the first time that the trial court erred in failing to instruct on the natural and probable consequences doctrine. However, "[i]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075; *People v. Dixon* (2007) 153 Cal.App.4th 985, 996.) Appellant has also forfeited this claim by failing to raise it in the trial court. (*People v. Seaton* (2001) 26 Cal.4th 598, 641; *People v. Becker* (2010) 183 Cal.App.4th 1151, 1156.)

However, even considering the argument on the merits, there was no error. Our Supreme Court held in *People v. Prettyman, supra,* 14 Cal.4th at pp. 268-269, that "instructions on the 'natural and probable consequences' rule are required only when the prosecution has elected to rely on that theory of accomplice liability, and then, only when substantial evidence supports the theory." (*People v. Sakarias* (2000) 22 Cal.4th 596, 627; see also *People v. Prieto* (2003) 30 Cal.4th 226, 247.) Moreover, other than arguing there was no evidence appellant encouraged or assisted Swayne in driving under the influence or driving in a reckless manner, i.e., no basis for accomplice liability, appellant fails to explain how the natural and probable consequences doctrine would apply in this case.

C.      *The Flight Instruction*.

Appellant contends the trial court erred in giving a flight instruction advising the jury that it could infer consciousness of guilt from the fact that appellant left the scene. Appellant argues this was error because a flight instruction is only proper where a defendant leaves the scene under circumstances showing that his departure was "motivated by a consciousness of guilt" (*People v. Ray* (1996) 13 Cal.4th 313, 345), but appellant was merely a passenger who would not have known that he could face criminal liability.

The trial court provided the following instruction to the jury: "If [appellant] fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that [appellant] fled, it is up to you to decide the meaning and

14

importance of that conduct.  However, evidence that the defendant fled cannot prove guilt by itself."

As an initial matter, appellant did not object to the flight instruction and therefore has forfeited this claim.  (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.)

The claim also fails on the merits.  " 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' [Citations.]  Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.]"  (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)  To be entitled to the instruction, the prosecution need not prove that the defendant fled in order to avoid arrest; rather, there must be evidence of the defendant's departure from the crime scene from which a jury permissibly could infer consciousness of guilt.  (*Id.* at p. 328.)

Here, when the car crashed, both appellant and Swayne were in the driver's seat, one on top of the other, and both had been drinking.  A witness who heard the crash from her apartment across the street saw the car smashed into the pole with a lot of smoke inside.  She testified that she could hear more than one voice loudly crying for help. From her porch, she watched the situation worsen—smoke in the car became fire—as she called 911 three times.  Between her first and second calls to 911, she saw a man emerge from the smoke of the crash and run across the street, away from the scene.  From this evidence, the jury could have inferred that appellant fled the scene with "a purpose to avoid being observed or arrested."  (*People v. Crandell* (1988) 46 Cal.3d 833, 869, overruled on another point in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.)

We also reject appellant's argument that the flight instruction deprived him of due process because the inference it permitted the jury to draw was irrational in light of his status as merely a passenger in the car.  "The due process clauses of the federal Constitution (U.S. Const., 5th & 14th Amends.) require a relationship between the permissively inferred fact and the proven fact on which it depends. . . . [¶]  As the United States Supreme Court has observed:  'A permissive inference does not relieve the State of

15

its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.) Furthermore, "[i]t is for the jury to determine to which offenses, if any, the inference should apply." (*Ibid.*) Based on the evidence presented, the permissible inferences were not irrational and the flight instruction was not improper.

D.    *Substantial Evidence Supports the Convictions.*

Appellant next contends that there was "no evidence, as required by *Verlinde*, that appellant ever exerted physical control over the car," and thus his convictions for gross vehicular manslaughter while intoxicated and drunk driving with injury were unsupported by the evidence.

In evaluating the sufficiency of the evidence on appeal, the court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The appellate court must also " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (*Id*. at pp. 576-577.)

Appellant's convictions for gross vehicular manslaughter and drunk driving causing injury based on aiding and abetting were supported by substantial evidence. Aiding and abetting requires that appellant intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime. (*People v. Marshall*, *supra*, 15 Cal.4th at p. 40; *People v. Beeman*, *supra*, 35 Cal.3rd at p. 561.) Here, appellant sat in the driver's seat and allowed Swayne, who was intoxicated, to sit on his lap, and thereby facilitated her grossly negligent behavior of driving while intoxicated and squeezed into a space from which she could not have safely driven the vehicle. The vehicle traveled over four miles, passed through at least seven controlled intersections, and was traveling between 44 and 50 miles per hour at the time of impact. There were no skid marks, indicating that no one tried to brake after failing to navigate

16

the curve in the road. From this evidence, the jury reasonably could find that appellant was guilty of these offenses under an aiding and abetting theory.

Based on the same evidence, the jury could also reasonably have inferred that appellant operated the vehicle and thus was guilty as a direct perpetrator. Appellant was in the driver's seat of his own car. No evidence precludes the finding that he may have reached the pedals, held the steering wheel, or otherwise exerted some control over the vehicle over the course of the four mile drive.

E.      *Prosecutorial Misconduct/Ineffective Assistance of Counsel.*

Appellant argues that defense counsel was ineffective for responding inadequately to prosecutorial misconduct during closing argument. Specifically, appellant contends that defense counsel failed to object to the prosecutor's arguing facts not in evidence and offered the wrong objection to an alleged reference by the prosecutor to appellant's failure to take the stand during rebuttal.

"To establish a clam of ineffective assistance of counsel, the accused must show that the trial attorney's representation was deficient, in that it fell below an objective standard of reasonableness, and that the accused was prejudiced by the trial attorney's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To establish prejudice, the accused must show that but for the trial attorney's assertedly deficient representation it was reasonably probable that the outcome of the proceeding would have been more favorable to the accused. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 688, 693-694; *People v. Ledesma*, *supra*, 43 Cal.3d at pp. 215-218.)" (*People v. Donaldson* (2001) 93 Cal.App.4th 916, 931-932.)

1.      *The prosecutor's argument regarding the driver's seat.*

During closing argument, the prosecutor stated: "The moment that [appellant] got into the driver's seat, *adjusted the driver's seat* and allowed Cheleia Swayne to climb into his lap, is the moment that his liability attaches. Because even if you don't want to call him the driver, you think for some reason he was too short, couldn't have reached the

17

pedals, and the only testimony we have is Cheleia Swayne's hands were on the wheel, he allowed her and encouraged her and facilitated her driving in this reckless manner.

"As I said before, if it would have been one or the other sitting in the driver's seat and speeding in the way that they were, you'd have ordinary negligence. And the reason you have gross negligence is because she climbs in and at that point they drive away over four miles. You saw the various stoplights, stop signs, you saw that this is not some remote country road out in the middle of nowhere where you don't have cars to dodge or people to dodge or anything else of that nature. The moment that she climbed onto his lap, and if you believe she was the one who was steering and operating the pedals, is the moment that his liability and responsibility attaches. Because he facilitated and allowed her to commit this crime of grossly negligent vehicular manslaughter while intoxicated.

"You were instructed that those who aide and abet a crime and those who directly perpetrate the crime are principals, are equally guilty of the commission of that crime. Even if you believe that Cheleia Swayne was the person who is in complete physical control of the vehicle but you believe that [appellant], in sitting in the way that he did, *fixing the seat* so that it allowed her the room to sit in the way that she did and then facilitating her driving in the way that she did, they are both equally culpable." (Italics added.)

Appellant contends that the italicized portions of the above-quoted argument, in which the prosecutor argued that appellant moved the driver's seat back, were not based on the evidence and that defense counsel could not have had a strategic reason for failing to object.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.]

18

As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

"The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it." (*People v. Harris* (2005) 37 Cal.4th 310, 345; see also, *People v. Morales* (2001) 25 Cal.4th 34, 44 ["At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom"].) " ' " 'It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see also, *People v. Young* (2005) 34 Cal.4th 1149, 1197 ["Counsel may argue facts not in evidence that are common knowledge or drawn from common experiences"].) In adopting the " 'reasonable likelihood' " standard of review of claims of improper argument by a prosecutor, the Supreme Court stated: "We presume that jurors treat . . . the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.)

Applying these rules, we find no misconduct. Although there was no direct testimony that appellant moved the driver's seat back, the inference was reasonable based on the evidence. Everett Jackson testified that, when Swayne pulled up in the black Lexus at the Sports Page bar, Swayne got out of the car and Ross, who was in the front passenger seat, stayed in the car. Jackson got in the back seat behind the driver's seat. Appellant got in the driver's seat and Swayne sat on his lap. Jalisha Harris testified that when the group picked her up that night from the Alvingroom Apartments, the right rear

19

passenger door was open for her and Jackson was sitting in the middle of the back seat. Once Harris got in the car, she could see that "the front driver's seat was leaned back and [Swayne] was sitting on top of [appellant's] lap and La'Camii [Ross] was in the front right passenger seat." The driver's seat was pushed and leaned so far back that no one could sit behind it in the back seat. Although there is a conflict in the evidence as to whether Jackson was picked up before Harris, or vice versa, the evidence shows that, at some point in the evening, a person could sit behind the driver's seat and, at another point, a person could not. The jury could have inferred that appellant or Swayne moved the seat. Accordingly, the prosecutor's argument was not improper.

2.	*The prosecutor's reference to the absence of evidence*.

In her rebuttal argument, the prosecutor stated: "You know if Damarcus Thompson, instead of getting into that driver's seat would have gotten into the rear passenger seat or the left rear passenger seat, he probably would have survived the accident and would have been here as a victim or a witness in this case. But once he chose to sit in that seat, allow her or ask her to sit on his lap and impact the driving of that vehicle, he's responsible for the collision, the injuries, and the death that followed. By his conduct, he aided and assisted and encouraged. By his conduct, he encouraged her to drive in the reckless manner that she did. *If there had been any evidence that he tried to stop her or tried to get out of the seat or tried in any way to prevent this from happening, you would have heard it.*" (Italics added.)

Appellant contends the italicized portion of the prosecutor's argument was an improper comment on appellant's assertion of his Fifth Amendment right not to testify. "Under the rule in *Griffin v. California* [(1965)] 380 U.S. 609 [(*Griffin*)], error is committed whenever the prosecutor . . . comments upon defendant's failure to testify. [Citation.] However, not every comment upon defendant's failure to present a defense constitutes *Griffin* error." (*People v. Vargas* (1973) 9 Cal.3d 470, 475.) A prosecutor may commit *Griffin* error "if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand. [Citations.]"

20

(*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.)  The rule does not extend to a prosecutor's comments on the state of the evidence, "including the failure of the defense to introduce material evidence or to call witnesses."  (*People v. Mincey* (1992) 2 Cal.4th 408, 446; see also *People v. Medina* (1995) 11 Cal.4th 694, 756.)

The prosecutor's statement here that if there were evidence that appellant tried to stop Swayne or get out of the seat, it would have been presented, was proper comment on the state of the evidence.  Moreover, that comment did not improperly reference appellant's decision not to testify; appellant was not the only witness who could have testified to such evidence.

Appellant also argues that the prosecutor's comments about the driver's seat were *Griffin* error.  He asserts that only five people could have testified about how the driver's seat got pushed back, i.e., appellant, Swayne, Ross, Harris, and Jackson.  Of these, Swayne asserted her right not to testify; Ross died in the crash; Harris testified that the seat was already back when the group picked her up; and Jackson testified that he did not see anyone push the seat back.  According to appellant, he was the only one who could have contradicted the prosecutor.

The comments about the driver's seat cannot fairly be interpreted as referring to appellant's failure to testify.  Both Harris and Jackson testified about the position of the driver's seat, and, in arguing that appellant adjusted the seat, the prosecutor was drawing a reasonable inference based on the evidence.  She did not allude to appellant's failure to testify, and these comments would not have required appellant to take the stand.  "In any event, 'indirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.  [Citations.]'  [Citation.]" (*People v. Bradford*, *supra*, 15 Cal.4th at pp. 1339-1340.)  Here, the prosecutor's brief remarks did not invite the jury to draw an inference of guilt from appellant's failure to testify.

Moreover, the trial court instructed the jury that appellant could rely on the state of the prosecution's evidence and not to draw any inference from appellant's failure to testify.  The jury was also instructed on the prosecution's burden of proof and the

21

presumption of innocence. "The court's instructions, not the prosecutor's argument, are determinative, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Mayfield* (1993) 5 Cal.4th 142, 179.) Given the instructions, and viewing the prosecutor's arguments as a whole, we see no "reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.)

F.       *The Trial Court's Exercise of Its Sentencing Discretion*.

The court sentenced appellant as follows: (1) to the midterm of six years on count 1, plus five years for the Vehicle Code section 20001, subdivision (c), enhancement, to be served consecutively; (2) one-third the midterm of two years, for a total of eight months, on count 2, to be served consecutively, plus one year for the Vehicle Code section 23558 enhancement as to Harris, to be served consecutively; plus one year for the Vehicle Code section 23558 enhancement as to Jackson, to be served consecutively; plus three years for the Penal Code section 12022.7, subdivision (a), enhancement as to Harris, to be served consecutively; plus three years for the Penal Code section 12022.7, subdivision (a), enhancement as to Jackson, to be served consecutively; plus 60 days for the Vehicle Code section 23582 enhancement, to be served consecutively; and (3) one-third the midterm of three years, for a total of one year, to be served consecutively to counts 1 and 2.[4]

Appellant contends that the court abused its discretion in imposing midterm sentences and ordering that they run consecutively.

Respondent asserts that appellant forfeited the claim. "[T]he right to challenge a criminal sentence on appeal is not unrestricted. In order to encourage prompt detection and correction of error, . . . reviewing courts have *required* parties to raise certain issues at the time of sentencing. In such cases, lack of a timely and meaningful objection

---

[4] The court stayed the count 2 enhancements as to Ross pursuant to Penal Code section 654.

22

forfeits or waives the claim. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 351.) The forfeiture "rule applies to 'cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons' [citation], but the rule does not apply when the sentence is legally unauthorized [citation]." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751.) "[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott*, *supra*, 9 Cal.4th at p. 356.) Here, appellant failed to object to the sentence imposed by the court. His sentencing claims are forfeited.

Nor can appellant show prejudice as a result of trial counsel's failure to object because the claims of sentencing error have no merit. Appellant contends that, as a passenger who passively sat behind the driver and failed to prevent her from driving in a grossly negligent manner, his culpability was less than that of the average offender and, therefore, the trial court erred in imposing midterm sentences and consecutive sentences.

Sentencing decisions are reviewed for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) Under this standard, a trial court's exercise of discretion will not be disturbed, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Jordan* (1986) 42 Cal.3d 308, 316 1067, 1113.) " 'In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.]" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.)

Penal Code section 1170, subdivision (b), provides in part: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . The court shall select the term which, in the court's discretion, best serves the interests of justice. The court shall set forth on the record the reasons for imposing the term selected . . . ."

The court is also required to state its reasons for imposing consecutive sentences. (Cal. Rules of Court, rule 4.406, subd. (b).)

Here, the trial court set forth its reasons for the sentence at length from the bench at the sentencing hearing. First, the court expressly rejected appellant's counsel's argument, i.e., that although appellant should not have left the scene, "there could have been many reasons why my client in this situation left the scene as he did;" and that, since this was an "unusual case . . . as to what happened and the conduct of my client in that car leading up to the crash, or the lack of his conduct," appellant should be granted probation in the interests of justice. Among other observations, the court cited appellant's lack of remorse; that he lied to the probation officer that he had stopped drinking when he was 20 years old[5]; that he potentially could have saved La'Camii Ross if he had just tried to pull her out of the car rather than running away; and that he evaded the police for two years after the crash, including changing his appearance. The trial court also considered the probation report and voluminous evidence regarding the devastating effect Ross's death had on her family, friends, and school and home communities.

In addition, by its verdict, the jury rejected appellant's theory that he was merely a passive passenger in the car with no more responsibility for what happened than any of the other passengers/victims. As the trial court instructed the jury: "Those who aid and abet a crime and those who directly perpetrate the crime are principals and equally guilty of the commission of that crime. The trial court's sentence of the middle term on the gross vehicular manslaughter offense was within its broad discretion.[6]

The trial court also has broad discretion to impose consecutive sentences when a defendant is convicted of two or more crimes. (Pen. Code, § 669; *People v. Shaw* (2004)

---

[5] In August 2009, when the accident happened, appellant was 25 years old.

[6] Once the trial court decided to impose consecutive sentences, it had no discretion to exercise with respect to the subordinate counts, i.e., drunk driving causing injury and leaving the scene of an accident involving injury, because Penal Code section 1170.1, subdivision (a), requires that consecutive subordinate counts be sentenced to one-third of the middle term.

122 Cal.App.4th 453, 458.) Rule 4.425 of the California Rules of Court sets forth criteria the court may consider in determining whether a sentence should be concurrent or consecutive. These criteria are not exclusive: "[t]he enumeration in these rules of some criteria for the making of discretionary sentencing decisions does not prohibit the application of additional criteria reasonably related to the decision being made." (Cal. Rules of Court, rule 4.408, subd. (a).) Any circumstance in aggravation or mitigation may be considered in determining whether to impose consecutive rather than concurrent sentences, with the exceptions of a fact used to impose the upper term, a fact used to otherwise enhance the defendant's prison sentence, and a fact that is an element of the crime. (Cal. Rules of Court, rule 4.425.) Only one factor or criterion in aggravation is sufficient to support a consecutive sentence. (*People v. Bravot* (1986) 183 Cal.App.3d 93, 98.) In addition, " '[a] trial court may minimize or even entirely disregard mitigating factors without stating its reasons.' " (*People v. Zamora* (1991) 230 Cal.App.3d 1627, 1637.)

The trial court did not abuse its discretion in ordering the sentences to run consecutively. There was no indication that the trial court did not recognize or failed to exercise its discretion to sentence concurrently or consecutively, and its reliance on the single factor of appellant's having shown "absolutely . . . no remorse" is sufficient to support consecutive sentences. The court's stated reasons at the sentencing hearing, as well as additional factors stated in the probation report, provide ample additional support for the court's determination.

Finally, as respondent points out, it appears that the trial court imposed full term sentencing enhancements on count 2, a subordinate offense, under Penal Code section 12022.7, subdivision (a), and Vehicle Code section 23582. The added custodial period for these sentences appears contrary to Penal Code section 1170.1, subdivision (a), which provides that the subordinate term for each consecutive offense "shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses." Appellant makes no mention of this in his reply brief, but in the interest of justice, we will remand to the trial court for resentencing. (See *People v. Rodriguez*

25

(2009) 47 Cal.4th 501, 509 ["[r]emand will give the trial court an opportunity to restructure its sentencing choices"]; *People v. Navarro* (2007) 40 Cal.4th 668, 681 ["remand for a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances"].)

## IV.  DISPOSITION

The sentence is vacated and the matter is remanded for resentencing on all counts. In all other respects, the judgment is affirmed.


_____
Haerle, Acting P.J.


We concur:


_____
Lambden, J.


_____
Richman, J.